UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **Quintin M. Littlejohn**, | C/A No. 7:06-0854-RBH-WMC |
| Plaintiff, | |
| vs. | **Report and Recommendation** |
| **George W. Bush**, President of the United States; United Nations Security Council; **Alberto R. Gonzales**, Attorney General of the United States; **United States of America**; and **All Agents in Active Concert**, both as a group and independently, | |
| Defendants. | |

# *Background of this Case*

The *pro se* plaintiff is under an order of pre-filing review. *See* Graham v. Riddle, 554 F.2d 133, 134-135 & n. * (4th Cir. 1977).[1] The plaintiff was confined in the South Carolina Department of Corrections until May of 2003,

---

[1] The order of pre-filing review was entered on July 10, 1998, by the Honorable G. Ross Anderson, Jr., United States District Judge, in Quintin Littlejohn v. William J. Clinton, President of the United States, Civil Action No. 6:98-1169-13AK. Judge Anderson's order authorizes the Clerk's Office to assign civil action numbers to the plaintiff's pleadings for docket control purposes.

1

when he "maxed out" his sentence for his 1982 conviction for armed robbery entered in the Court of General Sessions for Cherokee County. The plaintiff is now a resident of Gaffney, South Carolina.

The plaintiff has brought suit against the President of the United States, the United Nations Security Council, the Attorney General of the United States, the United States itself, and "All Agents in Active Concert." The plaintiff appears to be contending that other countries, including what is now known as the Islamic Republic of Iran,[2] have to the right to develop nuclear power. The plaintiff states that he is bringing suit on behalf of the

---

[2]The above-captioned case is the second case filed by the plaintiff concerning United States foreign policy toward Iran. In the pleadings filed by the plaintiff in Quintin Littlejohn v. Bill Clinton, et al., Civil Action No. 2:00-2925-13AK, the plaintiff complained about the overthrow of the Qajar Dynasty, which ruled Iran from the late Eighteenth Century until the Twentieth Century. See Lucein J. Dhooge, Meddling with the Mullahs: An Analysis of the Iran and Libya Sanctions Act of 1996, 27 Denver J. Int'l L. & Pol'y 1, 6-7 (Fall 1998):

> Although a complete history of the volatile relationship between the United States and Iran is beyond the scope of this article, a brief review of the recent highlights of this relationship is in order to place ILSA in its proper context. Modern Iranian history began in 1921 when Reza Khan, an Iranian officer of the Persian Cossack Brigade, engineered a coup d'etat against the government of Ahmad Shah of the Qajar dynasty. * * * Reza Khan ousted Ahmad Shah and gained complete control of the government in 1925. * * * Reza Khan subsequently declared himself Shah, ruling as Reza Shah Pahlavi until his forced abdication following the occupation of Iran by British and Soviet forces in September 1941. * * * Reza Shah Pahlavi was succeeded by his son, Mohammad Reza Pahlavi, who ruled Iran until January 1979.

Allied Military Government, Al Malik Salam Muhagmin,[3] and the Islamic Republic of Iran.

In the above-captioned case, the petitioner uses his often-repeated phrase "K-DLLL" with respect to the "World Court."[4] (Complaint, at page 2). *See also* plaintiff's Answer to Court's Special Interrogatory (Entry No. 2) in

---

[3]Al Malik Salam Muhagmin is not identified in the complaint.

[4]The plaintiff is obviously referring to the International Court of Justice, which is a [j]udicial arm of the United Nations." Black's Law Dictionary, (fifth edition, 1979), at page 732. The International Court of Justice:

> * * * has jurisdiction to give advisory opinions on matters of law and treaty construction when requested by the General Assembly, Security Council or any international agency authorized by the General Assembly to petition for such opinion. It has jurisdiction, also, to settle legal disputes between nations when voluntarily submitted to it. Its judgments may be enforced by the Security Council. Its jurisdiction and powers are defined by statute, to which all member states of the U.N. [United Nations] are parties. Judges of such court are elected by the General Assembly and Security Council of the U.N.

*See also* Vera Gowlland-Debbas, The Relationship between the International Court of Justice and the Security Council in Light of the Lockerbie Case, 88 Am. J. Int'l L. 643 (October 1994)("The relationship between the International Court of Justice and the Security Council may be approached from the perspective of the United Nations Charter and the way it delimits competences between two principal UN organs and regulates the exercise of their concurrent powers."); Taslim O. Elias, The International Court of Justice and Some Contemporary Problems (1979); Josh Briggs, Comment, Sur Place Refugee Status in the Context of Vietnamese Asylum Seekers in Hong Kong, 42 Am. U. L. Rev. 433, 457 (Winter 1993); and Gregory Gelfand, International Penal Transfer Treaties: The Case for an Unrestricted Multilateral Treaty, 64 Boston U. L. Rev. 563, 568 & n. 17 (May 1984). The International Court of Justice is the successor to the Permanent Court of International Justice. *See* Gowlland-Debbas, The Relationship between the International Court of Justice and the Security Council in Light of the Lockerbie Case, supra, 88 Am. J. Int'l L. at 643 n. 1 ("By contrast, the Permanent Court of International Justice, though closely related to the League of Nations, was independent of it.").

Quintin Littlejohn v. Bill Clinton, *et al.*, Civil Action No. 6:01-2285-13AK, where in the petitioner, in response to a Special Interrogatory from this court, explained what the acronym "K-DLLL" meant. The acronym "K-DLLL" stands for "Kosovo Doctrine Littlejohn Litigation Law."

# *Discussion*

Under established local procedure in this judicial district, a careful review has been made of the *pro se* pleading and the Form AO 240 (motion to proceed *in forma pauperis*) pursuant to the procedural provisions of 28 U.S.C. § 1915. The review has been conducted in light of the following precedents: Denton v. Hernandez, 504 U.S. 25, 118 L.Ed.2d 340, 112 S.Ct. 1728, 1992 U.S. LEXIS® 2689 (1992); Neitzke v. Williams, 490 U.S. 319, 324-325, 1989 U.S. LEXIS® 2231 (1989); Haines v. Kerner, 404 U.S. 519 (1972); Nasim v. Warden, Maryland House of Correction, 64 F.3d 951, 1995 U.S.App. LEXIS® 26108 (4th Cir. 1995)(*en banc*), *cert. denied*, 516 U.S. 1177, 134 L.Ed.2d 219, 116 S.Ct. 1273, 1996 U.S. LEXIS® 1844 (1996); Todd v. Baskerville, 712 F.2d 70 (4th Cir. 1983); and Boyce v. Alizaduh, 595 F.2d 948 (4th Cir. 1979)(recognizing the district court's authority to conduct

4

an initial screening of a *pro se* filing).[5] This court is required to construe *pro se* complaints and petitions liberally. *Pro se* complaints and petitions are held to a less stringent standard than those drafted by attorneys, Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir.), *cert. denied*, Leeke v. Gordon, 439 U.S. 970 (1978), and a federal district court is charged with liberally construing a complaint or petition filed by a *pro se* litigant to allow the development of a potentially meritorious case. *See* Hughes v. Rowe, 449 U.S. 5, 9-10 & n. 7 (1980)(*per curiam*); and Cruz v. Beto, 405 U.S. 319 (1972). When a federal court is evaluating a *pro se* complaint or petition, the plaintiff's or petitioner's allegations are assumed to be true. Fine v. City of New York, 529 F.2d 70, 74 (2nd Cir. 1975). Even under this less stringent standard, the complaint is subject to summary dismissal. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Department of Social Services, 901 F.2d 387, 1990 U.S.App. LEXIS® 6120 (4th Cir. 1990).

---

[5]Boyce has been held by some authorities to have been abrogated in part, on other grounds, by Neitzke v. Williams, 490 U.S. 319 (1989)(insofar as Neitzke establishes that a complaint that fails to state a claim, under Federal Rule of Civil Procedure 12(b)(6), does not by definition merit *sua sponte* dismissal under 28 U.S.C. § 1915(e)(2)(B)(i) [formerly 28 U.S.C. § 1915(d)], as "frivolous").

Generally, a case can be originally filed in a federal district court if there is diversity of citizenship under 28 U.S.C. § 1332 or there if there is so-called "federal question" jurisdiction under 28 U.S.C. § 1331. Federal courts are courts of limited jurisdiction, "constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute." In re Bulldog Trucking, Inc., 147 F.3d 347, 352, 1998 U.S.App. LEXIS® 13210 (4th Cir. 1998). Since federal courts have limited subject matter jurisdiction, there is no presumption that the court has jurisdiction. Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399, 1999 U.S.App. LEXIS® 20859 (4th Cir. 1999), *cert. denied*, Pinkley, Inc. v. Servacek, 528 U.S. 1155, 2000 U.S. LEXIS® 1043 (2000)(*citing* Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 337, 327 (1895)). Accordingly, a federal court is required, *sua sponte*, to determine if a valid basis for its jurisdiction exists, "and to dismiss the action if no such ground appears." Bulldog Trucking, supra, 147 F.3d at 352. *See also* F. R. Civ. P. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

"[T]he facts providing the court jurisdiction must be affirmatively alleged in the complaint." Davis v. Pak, 856 F.2d 648, 650, 1988

U.S.App. LEXIS® 12311 (4th Cir. 1988)(*citing* McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936)).  To this end, Federal Rule of Civil Procedure 8(a)(1) requires that the complaint provide "a short plain statement of the grounds upon which the court's jurisdiction depends[.]"  If, however, the complaint does not contain "an affirmative pleading of a jurisdictional basis, the federal court may find that it has jurisdiction if the facts supporting jurisdiction have been clearly pleaded."  Pinkley, Inc., supra, 191 F.3d at 399 (*citing* 2 Moore's Federal Practice § 8.03[3] (3rd edition 1997)).

Although the absence of subject matter jurisdiction may be raised at any time during the case, determining jurisdiction at the outset of the litigation is the most efficient procedure.  Lovern v. Edwards, 190 F.3d 648, 654, 1999 U.S.App. LEXIS® 20860 (4th Cir. 1999).  If the court, viewing the allegations in the light most favorable to the plaintiff, finds insufficient allegations in the pleadings, the court will lack subject matter jurisdiction. Id.

All defendants in the above-captioned case are entitled to summary dismissal under the "political question" doctrine.  Under the "political question" doctrine, the United States District Court for the District of South

Carolina cannot address the plaintiff's claims relating to an alliance or alliances of the United States, its foreign policy toward nations seeking to acquire nuclear power or nuclear weapons, or matters handled by the United Nations Security Council. The plaintiff's claims about are "political questions" because they relate to foreign policy of the United States and of various other countries. Goldwater v. Carter, 444 U.S. 996, 1002-1006 (1979). The "political question" doctrine discountenances judicial interference with certain types of cases involving the other branches of the Government of the United States. Baker v. Carr, 369 U.S. 186, 211 (1962).

In short, the claims presented by Mr. Littlejohn in the case at bar involve the authority of the President in the conduct of foreign relations, the authority of the Senate to ratify treaties, and relationships among third countries. Goldwater v. Carter, supra, 444 U.S. at 1002-1003. *See also* Dellums v. Bush, 752 F. Supp. 1141, 1990 U.S.Dist. LEXIS® 16611 (D.D.C. 1990); and Eckert International v. Government of the Sovereign Democratic Republic of Fiji, 834 F. Supp. 167, 171, 1993 U.S.Dist. LEXIS® 13604 (E.D.Va. 1993)(purpose of "political question" doctrine is "to prevent judicial pronouncements that would disrupt this country's foreign relations"), *affirmed*, Eckert International v. Government of the Sovereign Democratic

Republic of Fiji, 32 F.3d 77, 1994 U.S.App. LEXIS® 20704 (4th Cir. 1994). *Cf*. Flast v. Cohen, 392 U.S. 83, 97 (1968)(federal judicial power usually limited to disputes capable of being resolved through judicial process); and FCC v. Pacifica Foundation, 438 U.S. 726, 735 (1978)("[F]ederal courts have never been empowered to issue advisory opinions.").

The plaintiff cannot "represent" the "Allied Military Government." The undersigned has pointed out, in many of the plaintiff's prior cases, that the Allied Military Government no longer exists.[6]

---

[6]Quintin Littlejohn is, once again, obviously referring to the entity that governed the British, American (United States), and French sectors of Germany after the surrender of the Nazi regime on May 8, 1945, until the establishment of the Federal Republic of Germany in 1949. *See* Edward M. Andries, On the German Constitution's Fiftieth Anniversary: Jacques Maritain and the 1949 Basic Law (Grundgesetz), 13 Emory Int'l L. Rev. 1(Spring 1999):

> It was not until after the experience of the Nazi regime that German jurists, along with their academic colleagues elsewhere in Europe, refocused their interest on the essence and potential of natural law theory. This juridical soul-searching took place while the Allies assisted a defeated Germany in outlining its future. During this same period, Jacques Maritain published and lectured throughout Europe. He represented the French government as its ambassador to the Vatican and led United Nations conferences on the soon-to-be- ratified Universal Declaration of Human Rights. * * *
>
> After the defeat of Germany, the Allies divided the country into four zones, occupied by the Soviet Union, France, Britain, and the United States. The Soviet Union's fears of a united Germany kept it from joining the Western countries, who combined their occupied territories. The three Western Allies prompted German leaders to convene a constituent assembly to draft a constitution for a new (West) Germany. * * * The Allies produced the famous "Frankfurt Documents," which required a democratic constitution

(continued...)

⁶(...continued)
> that established a federal republic with protection for the rights of its constituent states and citizens. * * *
>
> The Parliamentary Council, responsible for drafting the new constitution, consisted of representatives elected by the state parliaments in the Western Occupation zones. This Council, chaired by Konrad Adenauer, adopted the Basic Law on May 8, 1949, by a vote of fifty-three to twelve. After ratification by the state parliaments, the Parliamentary Council promulgated the Basic Law on May 23, 1949.

*See also* Wolfgang Friedmann, The Allied Military Government of Germany (1947).

During the first fifty years of the Federal Republic of German (West Germany), the Allied Military Government, technically, continued to function, especially in West Berlin. *See* Mathias Reimann, Takeover: German Reunification Under a Magnifying Glass, 96 Mich. L. Rev. 1988  (May, 1998):

> In the meantime, the Two-Plus-Four negotiations, between the two German states and the four World War II allies, advanced toward the renunciation of the rights that the allies still had with regard to Germany and, especially, Berlin. On September 12, after the principal players, the West German and Soviet governments, had reached agreement on the crucial issues, the Two-Plus-Four Treaty was signed. It provided for German reunification, accorded Germany full sovereignty, and thus finally closed the post-World War II period in Europe.

As a result of the reunification of Germany in 1990 and the ratification of the "Two-Plus-Four" Treaty in 1991, the Allied Military Government for Germany has no longer existed:

> On October 3, 1990, the GDR ceased to exist and its territory became part of the Federal Republic of Germany. The five states formed in the GDR under the statute of July 22, 1990 * * * — Brandenburg, Mecklenburg-Vorpommern, Sachsen, Sachsen-Anhalt and Thuringen — became Lander of the Federal Republic of Germany. East Berlin became part of Land Berlin. As far as German law is concerned, unification was implemented by the GDR's accession to the Federal Republic in accordance with Article 23 of the Federal Constitution. * * * The details were agreed upon in the Unification Agreement of August 31, 1990. * * *
>
> The act of unification, however, took place within a unique
>                                                        (continued...)

Moreover, the petitioner cannot represent the Allied Military Government, even if it still existed, because he is not admitted to practice before this court as an attorney, and does not have standing to bring suit on behalf of other persons or entities.  See Estate of Kerner v. United States, 895 F.2d 1159, 1162 & n. 3, 1990 U.S.App. LEXIS® 1995 (7th Cir. 1990), where the Court noted: "'the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim on the legal rights or interests of third parties.'"  For example, it is well settled that a *pro se* litigant may not represent a minor in a civil action.  See, *e.g.*, Tse-Ming Cheung v. Youth

---

[6](...continued)
international framework that had applied to Germany since 1945.  In the Berlin Declaration of June 5, 1945, the four Allied powers had assumed "supreme authority with respect to Germany." * * * This declaration had never been revoked, even though the Allies later entered into various treaties with each of the German states that altered their relationships, including the Convention on Relations of 1955.  Consequently, the Treaty on the Final Settlement with Respect to Germany was concluded by the Federal Republic of Germany, the German Democratic Republic and the four powers and signed in Moscow on September 12, 1990, immediately before the GDR acceded to the Federal Republic. * * * In Article 7 of the Treaty, the four powers terminated their rights and responsibilities relating to Berlin and to Germany as a whole. United Germany is to have full sovereignty over its internal and external affairs.  The Treaty entered into force on March 15, 1991, when the Soviet Union, as the last party, deposited its instrument of ratification. However, the four powers had already suspended operation of their rights in a declaration that took effect on October 3 with German unification.

Jochen A. Frowein, The Reunification of Germany, 86 Am. J. Int'l L. 152, 154-155 (Spring 1992).

Orchestra Foundation of Buffalo, 906 F.2d 59, 60-61, 1990 U.S.App. LEXIS® 10021 (2nd Cir. 1990).  "A non-attorney parent must be represented by counsel when bringing an action on behalf of a child."  Knox ex rel. Chambers v. Hayward Unified School District, 1995 U.S.Dist. LEXIS® 8379, 1995 WESTLAW®  364156 (N.D.Cal., June 1, 1995)(collecting cases).  Similar case law applies to suits purportedly brought by individual *pro se* litigants on behalf of corporations, partnerships, unincorporated associations, or estates.  *See*, *e.g.*, First Hartford Corporation Pension Plan and Trust, 194 F.3d 1279, 1290, 1999 U.S.App. LEXIS® 26237 (Fed.Cir. 1999)(*pro se* actions by non-attorneys on behalf of corporations "fail for lack of standing"); and Pridgen v. Andresen, 113 F.3d 391, 392-393, 1997 U.S.App. LEXIS® 11630 (2nd Cir. 1997)(*pro se* litigant may not represent corporation, estate, partnership, or "his or her minor child"), where the Court noted that such limits on *pro se* representation "serve the interests of the represented party as well as the interests of adversaries and the court."  *See also* Batac Development Corp. v. B&R Consultants, Inc., 2000 U.S.Dist. LEXIS® 3695, 2000 WESTLAW® 307400 (S.D.N.Y., March 23, 2000):

>It has uniformly been held by the Second Circuit and all of the other circuits that the provisions of 28 U.S.C. § 1654 * * * prohibit a non-attorney individual from representing a corporation in the federal courts. * * *
>
>Under the weight of this authority, Batac quite plainly cannot represent the interests of the plaintiff in this Court, even though he is the corporation's sole shareholder.  This consequence might puzzle Batac who undoubtedly believes that he can fairly and effectively advance the interests of his company in this litigation.  But sound reasons exist for this rule.  The interests of a corporation and its principal frequently overlap but are not identical in all respects.  Thus, requiring separate counsel for a corporation works as an independent safeguard of its interests.  Moreover, the Second Circuit has explained that the reasons for requiring a corporate litigant to have legal representation include principally that the conduct of litigation by a nonlawyer creates unusual burdens not only for the party he represents but as well for his adversaries and the court.  The lay litigant frequently brings pleadings that are awkwardly drafted, motions that are inarticulately presented, proceedings that are needlessly multiplicative.  In addition to lacking the professional skills of a lawyer, the lay litigant lacks many of the attorney's ethical responsibilities[.]

<u>Batac Development Corp. v. B&R Consultants, Inc.</u>, <u>supra</u>, 2000 WESTLAW® 307400 at *1-*2.

It should also be noted that the above-captioned case, insofar as the United Nations Security Council is concerned, is barred by the Foreign Sovereign Immunities Act of 1976 (as amended), 28 U.S.C. § 1602 *et seq*. *See, e.g.*, <u>Hirsh v. State of Israel and State of Germany</u>, 962 F. Supp. 377,

1997 U.S.Dist. LEXIS® 4406 (S.D.N.Y. 1997), *affirmed without opinion*, 133 F.3d 907, 1997 U.S.App. LEXIS® 36435, 1997 WESTLAW® (2nd Cir., December 31, 1997), *cert. denied sub nomine*, Berkowitz v. Israel, 523 U.S. 1062, 140 L.Ed.2d 651, 118 S.Ct. 1392, 1998 U.S. LEXIS® 2359 (1998). Furthermore, the Alien Tort Statute, 28 U.S.C. § 1350, does not provide a basis for the exercise of jurisdiction over a foreign sovereign. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 102 L.Ed.2d 818, 109 S.Ct. 683, 1989 U.S. LEXIS® 581 (1989)(generally, foreign nations are immune from suit in the United States for non-commercial, "public" acts).

Moreover, no state or federal court can issue process against the United Nations and any of its component agencies or bodies by virtue of the location of the United Nations Headquarters in New York City. *See* Curran v. City of New York, 191 Misc. 229, 77 N.Y.S.2d 206 (Supreme Court, Queens County, 1947)(International Organizations Immunities Act precludes suits against the United Nations; grant of public lands in New York City to the United Nations and exempting such lands from taxation were valid), *affirmed*, 275 A.D. 784, 88 N.Y.2d 924 (App.Div. 1949); and Bert B. Lockwood, The United Nations Charter and United States Civil Rights Litigation: 1946, 1955, 69 Iowa L. Rev. 901 (May 1984)(discussing

U.N. "Headquarters Agreement" [22 U.S.C. § 287] between United States and the United Nations), which cites, *inter alia*, Comment, The United Nations Under American Municipal Law: A Preliminary Assessment, 77 Yale L. J. 778 (1946), and Ling, A Comparative Study of the Privileges and Immunities of the United Nations Member Representatives and Officials with the Traditional Privileges and Immunities of Diplomatic Agents, 33 Washington & Lee L. Rev. 91 (1976).

# *Recommendation*

Accordingly, it is recommended that the District Court summarily dismiss the above-captioned case *without prejudice* and without issuance and service of process. *See* Denton v. Hernandez, supra; Neitzke v. Williams, supra; Haines v. Kerner, supra; Brown v. Briscoe, 998 F.2d 201, 202-204 & n. * (4th Cir. 1993), *replacing* unpublished opinion originally tabled at 993 F.2d 1535 (4th Cir. 1993); Boyce v. Alizaduh, supra; Todd v. Baskerville, supra, 712 F.2d at 74; and 28 U.S.C. § 1915(e)(2)(B)[essentially a redesignation of "old" § 1915(d)]. *See also* In Re Prison Litigation Reform Act, 105 F.3d 1131, 1134, 1997 U.S.App. LEXIS® 1763 (6th Cir.

1997)(pleadings by non-prisoners should also be screened); and <u>Fitzgerald v. First East Seventh Street Tenants Corp.</u>, 221 F.3d 362, 363-364, 2000 U.S.App. LEXIS® 18180 (2nd Cir. 2000)("District courts . . . are . . . capable of determining when an action is frivolous.  Indeed, as courts of first instance, district courts are especially likely to be exposed to frivolous actions, and thus have an even greater need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources.").  The plaintiff's attention is directed to the Notice on the next page.


March 21, 2006                             s/William M. Catoe
Greenville, South Carolina           United States Magistrate Judge

### Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"

### &

### The **Serious Consequences** of a Failure to Do So

The plaintiff is, hereby, notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within **ten (10) days** of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, **but not thereafter**, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. **Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections.** *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file specific, written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. *** This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only "I object" preserves no issue for review. *** A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 6 n. 1 (3rd Cir. 1984)(*per curiam*)("plaintiff's objections lacked the specificity necessary to trigger *de novo* review"). **This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections.** *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

**Larry W. Propes, Clerk**
**United States District Court**
**Post Office Box 10768**
**Greenville, South Carolina 29603**

17